Howell, Judge,
delivered the opinion of the court:
Plaintiff was retired from the Army on October 1, 1934, and from that date until September 30, 1945, he received the pay of a retired officer with the grade of captain. On May 29, 1945, plaintiff began employment in the Veterans’ Administration and drew dual pay until September 30,1945, when the retirement pay was stopped. This action is for the retirement pay from October 1, 1945, to date. The retirement pay was stopped because when combined with plaintiff’s *397 salary as an employee of the Veterans’ Administration, the total exceeded the statutory limitation of $3,000 per annum. The Adjutant General found, further, that plaintiff’s alleged disability did not come within the exceptions provided by the statute.
The pertinent statute is Section 3 of the Act of July 15, 1940, 54 Stat. 761, 5 TJ. S. C. 59a, which amended Section 212 of the Act of June 30, 1932, 47 Stat. 406. It provides:
(a) After June 30,1932, no person holding a civilian office or position, appointive or elective, under the United States Government or the municipal government of the District of Columbia or under any corporation, the majority of the stock of which is owned by the United States, shall be entitled, during the period of such incumbency, to retired pay from the United States for or on account of services as a commissioned officer in any of the services mentioned in Title 37, at a rate in excess of an amount which when combined with the annual rate of compensation from such civilian office or position, makes the total rate from both sources more than $3,000; and when the retired pay amounts to or exceeds the rate of $3,000 per annum such person shall be entitled to the pay of the civilian office or position or the retired pay, whichever he may elect. As used in this section, the term “retired pay” shall be construed to include credits for all service that lawfully may enter into the computation thereof.
(b) This section shall not apply to any person whose retired pay, plus civilian pay, amounts to less than $3,000: Provided, That this section shall not apply to regular or emergency commissioned officers retired for disability incurred in combat with an enemy of the United States or for disabilities resulting from an explosion of an instrumentality of war in line of duty during an enlistment or employment as provided in Veterans’ Regulation Numbered 1 (a), Part I, Paragraph I.[1]
Title 5 U. S. C. 64a provides as follows:
64a. Same; retired officers in Veterans’ Administration.
*398 Notwithstanding section 58, 59, or 62 of this title, the Administrator of Veterans’ Affairs may appoint to, and employ in, any civilian office or position in the Veterans’ Administration, and pay, any retired commissioned officer, or retired warrant officer, of the Army, Navy, Marine Corps, Coast Guard, Coast and Geodetic Survey, and Public Health Service. The retired status, office, rank, and grade of retired commissioned officers, or retired warrant officers, so appointed or employed and, except as provided in section 59a of this title, any emolument, perquisite, right, privilege, or benefit incident to or arising out of any such status, office, rank, or grade, shall be in no way affected by reason of such appointment to or employment in, or by reason of service in, or acceptance or holding of, any civilian office or position in the Veterans’ Administration or the receipt of the pay thereof. (Aug. 10,1946, ch. 950, § 1, 60 Stat. 978.)[2]
With, certain exceptions hereafter noted, the Congress established at an early date and the courts have upheld the policy which looks askance upon a citizen who holds two government appointments from which he draws dual compensation. Mr. Justice Story in United States v. Morse, 3 Story 87, Fed. Case No. 15820, 27 Fed. Cases 3, said, in part:
* * * The great object of the legislature was, not to cut down the reasonable emoluments of officers holding different offices, but to prohibit their union when incompatible with public policy, or to prevent and suppress the growing evil of extra compensation claimed for services purely incidental to a single office.
The Act of June 20,1874,18 Stat. 109, ch. 328, § 3, provided:
That no civil officer of the government shall hereafter receive any compensation or perquisites, directly or indirectly, from the Treasury or property of the United States, beyond his salary or compensation allowed by law * * *
See Hedrick and Warden's cases, 16 C. Cls. 88, and cases there cited upholding this statute.
The Act of March 3, 1885, 23 Stat. 356, § 2, contained the following provision reflecting the tenor of Sec. 1765 of the revised statutes of that period:
*399 That no part of the money herein or hereafter appropriated for the Department of Agriculture shall be paid to any person, as additional salary or compensation, receiving at the same time other compensation as an officer or employee of the government * * *
But, the Act of July 31, 1894, 28 Stat. 162, 205, contains this provision:
* * * No person who holds an office the salary or annual compensation attached to which amounts to the sum of two thousand five hundred dollars shall be appointed to or hold any other office to which compensation is attached unless specially heretofore or hereafter specially authorized thereto by law; but this shall not apply to retired officers of the Army or Navy whenever they may be elected to public office or whenever the President shall appoint them to office by and with the advice and consent of the Senate.
In construing the statutes of 1885 and 1894, this court held in the case of Andrew Geddes v. United States, 38 C. Cls. 428, that an officer on the retired list who, also, was Chief Clerk of the Department of Agriculture, was entitled to the salary of both offices, the salary as Clerk being $2,500 and the retirement pay being $1,755 per annum. This case was recently cited with approval by the court in Gibney v. United States, 114 C. Cls. 38.
This court has long recognized an exception to the general prohibition against dual government salaries as expressed also in Collins v. United States, 15 C. Cls. 22, and Fletcher v. United States, 26 C. Cls. 541, where it was held that the pay of a retired officer of the Army does not seem to be within either the letter or spirit of the terms “other compensation as an officer or employee of the government” and where it was determined that the pay of a retired Army officer is not “compensation” for any present service but rather is “an honorable form of pension for service to his country previously performed.”
It will readily be seen that the present law, the Act of July 14, 1940, 54 Stat. 761, 5 U. S. C. 59a, abandons the approach of statutes previously cited. Whereas it was previously provided that no person, excepting a retired Army or Navy officer, might receive dual compensation from the *400 government in excess of a total of $2,500, the present statute, under which we must decide this case, specifically prohibits retired commissioned officers drawing retirement pay from receiving, at the same time, compensation from civilian employment with the government at an annual rate which makes the total from both sources more than $3,000. Sullivan v. United States, 92 C. Cls. 154. The exceptions to this restriction which did not exist under the statutes when this court decided the Geddes, Collins and Fletcher cases, supra, are provided in Title 5, Sec. 59a, subsection (b), lifting the limitation of $3,000 for those officers “retired for disability incurred in combat with an enemy of the United States, or for disabilities resulting from an explosion of an instrumentality of war in line of duty * *
Plaintiff’s combined retirement pay and salary with the Veterans’ Administration was admittedly far in excess of $3,000. His case must thus stand or fall in the degree by which the facts thereof can be brought within the limitations of subsection (b) of Section 59a, Title 5, U. S. C. In other words, the question here arises as to whether, as a matter of fact, plaintiff was injured in line of duty and, if so, whether the disability for which plaintiff was retired resulted from “an explosion of an instrumentality of war.”
As stated in our Finding 7, plaintiff, in November 1920, a student officer at Camp (now Fort) Benning, Georgia, participated in rifle marksmanship training. While on duty in the pits he was allegedly struck in the left eye by sand and dirt from a ricocheting bullet. He says he paid no attention to it at the time, other than to ask for first aid. He now contends that this was such an “explosion of an instrumentality of war” as contemplated by the statute, and thus he comes within its limitations and is eligible to draw, contemporaneously, retirement pay as an officer and salary as an employee from the Veterans’ Administration.
The record is replete with evidence pertaining to the condition of plaintiff’s left eye over a long period of time. The findings delineate this evidence in detail and it is not necessary to recount it here. Suffice it to say, plaintiff had a “slight astigmatism” in his left eye as early as September *401 1918 when he applied for a commission as a First Lieutenant, but the condition of his eye was correctable to normal.
Although plaintiff claims that his left eye was injured, by sand and dirt from a ricocheting bullet while he was in the rifle pits at Fort Benning, there are no contemporaneous medical or other records to establish the incident or injury. The medical examination accorded plaintiff on February 13,1922, fifteen months after the alleged injury of November 1920, is the first examination of record subsequent to same, and reveals no damage to plaintiff’s left eye. Vision in both eyes was found to be normal. Again, later the same year, August 22, 1922, a special examination did not disclose any scar or mention of any injury to plaintiff’s eye. Plaintiff had requested this examination with a view toward his retirement for physical disability which was denied him after examination. Plaintiff received an annual physical examination until retirement in 1934, plus many special physical examinations. Yet, the only recorded reference to the alleged incident and injury is the statement plaintiff made when he appeared before the Eetirement Board on July 20,1934, fourteen years after the alleged injury:
Officer states that he received an injury to left eye in 1920 while he was on duty at the rifle pits at Fort Ben-ning, Georgia, when a richochett (sic) bullet struck the parapet knocking sand and dirt into the pits. His left eye was struck by some of the sand and dirt. * * *
Some confusion seems to persist in plaintiff’s mind as to when the injury took place. The Board quoted him as having stated it occurred in 1920. Plaintiff testified in this action that he told the Board about his “cornea having been damaged around 1922 or 1923.” Plaintiff’s annual 1923 physical examination, February 23,1923, is the first medical report that shows, “Small scar on cornea, left, outer, due to old injury. No symptoms.” Again, there was no explanation of the cause of injury or date of its occurrence.
There can be little doubt but that plaintiff’s left eye at some point in his life sustained a slight injury but the evidence adduced by plaintiff does not prove how nor when the injury occurred in line of duty as alleged. Further, the evidence fails to establish that such an injury, if it did occur, *402 resulted in plaintiff’s retirement. The Medical Board retired plaintiff for “defective hearing, both ears, which originated about 1930, and chorioretinitis, chronic, left, which originated about 1920.” The medical examination itself,, which is a part of the Betirement Board’s findings, omits, reference to chorioretinitis in the eye and records “Hyperopic astigmatism, bilateral. Presbyopia, bilateral. Betinitis, chronic, left. Vision: Left eye 20/200 correctable to 20/70. Bight: 20/40 correctable to 20/20.”
The Betirement Board clearly was in error in finding that chorioretinitis originated in plaintiff’s left eye about 1920 when his medical history establishes that it was first discovered at some time between January 12, 1927, at which time there was “no evidence of disease” in his eyes and June 3, 1927, at which time chorioretinitis was present in both eyes. The cause of this condition was never determined, nor has it been established that there is any causal connection between the chorioretinitis and a scar on the cornea in plaintiff’s left eye. Defective vision present at the time of plaintiff’s retirement was principally astigmatism, which condition was not service-connected but existed prior to plaintiff’s entry into the military service in 1918. Doubtless, this defective vision was further complicated by chorioretinitis which developed in 1927, by amblyopia which was congenital and by presbyopia in both eyes, due to age. Plaintiff contends that the real reason he was retired was astigmatism which was aggravated by the scar created by the alleged injury. Hyper-opic astigmatism, as defined in Finding 19, is a refractive error that is seen in an eyeball that is shorter than normal, and, in addition, has the presence of astigmatism. The astigmatism, as previously stated, existed prior to plaintiff’s military service and expert testimony as to whether or not the alleged injury could have produced such astigmatism is beside the point. There is no credible evidence in the case establishing that a scar on the cornea resulting from an external injury, caused the eyeball to shrink and become shorter than normal or aggravated a previously existing condition. Assuming, for the sake of argument, that the scar did cause an aggravation of a previously existing astigmatism, it is still not possible to charge defendant with the *403 scar under the facts as found. There is evidence that plaintiff had a loss of vision of congenital character.
In addition to the foregoing, we cannot escape the persuasive weight of the evidence in the record in the form of a reply by the Chief of the Eye Clinic at Walter Eeed General Hospital, an officer who has served on many Special Retiring Boards. Defendant’s attorney put to this medical expert a question based on the findings of the Board which retired plaintiff and which went as follows:
Q. 40. * * * in your opinion, would an Army officer in 1934, suffering only with defective vision in one eye, the vision being 20/200, correctable by glasses to 20/70 in one eye, and the other eye with a vision of 20/20, would this officer with this physical disability alone have been retired for medical reasons?
A. In my opinion that defect would not have constituted incapacitation to the degree warranting retirement.
The Retirement Board having erred in face of the undisputed medical record as to the date of the onset of chorioreti-nitis and the proof having failed to connect it with the alleged injury as a basis for retirement, there is left one additional ground found by the Retiring Board which held that plaintiff was—
* * * incapacitated for active service and that such incapacity is permanent; that the cause of said incapacity is defective hearing, both ears, which originated about 1930, and chorioretinitis, chronic, left, which originated about 1920. * * *
That portion of the medical examination which was a part of the Retirement Board’s findings and which pertained to the condition of plaintiff’s ears, stated:
Ears: Both tympanic membranes dull retracted and thickened. Right ear: 14/20. Left ear: 12/20.
The Chief of the Ear, Nose and Throat Section of the Walter Reed General Hospital testified in answer to questions from defendant’s attorney as follows:
Q. 17. If a man had 15/20 in both ears it would be 30/20 and he would be eligible for retirement under that theory (the numerator test used by the Army) ?
*404 A. That is correct.
Q. I show you plaintiff’s exhibit No. 5 and point out to you that the hearing in the right ear was 14/20 and the left ear 12/20, making a total of 26/20, which is less than the minimum of 80. Now, based on this, in your opinion, would a man appearing before the Retiring Board in that condition, that is, with 14/20 in one ear and 12/20 in the other ear, would that condition in and of itself alone, without any other physical defects, of any nature whatsoever, have been sufficient to have retired a man in 1934 ?
A. Yes, that could have been sufficient to cause his retirement.
Defendant’s medical expert testified that of the two defects here in question, of the ear alnd eye:
If there was any difference, the hearing defect would be slightly more of a handicap than the visual defect, because the man has one eye that corrects to normal or to 20/20, and he does not in either ear correct to normal.
■ Be that as it may, the cold fact of the matter is that plaintiff’s hearing fell below the minimum required by the Army and he was retired. He could have been retired on the ground in the absence of any trouble with his eye whatever, and in this case a review of the facts and careful evaluation of the evidence leads us to the inescapable conclusion that such was the only ground found by the Board upon which he could legally have been retired as he was on October 1, 1934.
There remain two matters upon which we do not find it necessary to pass. Defendant has laid great stress upon the unique behavior pattern of plaintiff whose physical disabilities seemed to have a way of becoming more acute and resulting in a request for retirement each time plaintiff was faced with possibility of discharge from the Army. The facts which we have found fail to establish plaintiff’s case without necessarily going into the question of whether or not the claim was brought in fraud or bad faith.
Had we been able to find that plaintiff’s left eye was injured in line of duty, as he alleges, we would face the necessity of determining whether such ah injury “resulted from an explosion of an instrumentality of war * * Judicial and *405 legislative intei’pretation of this phrase is lacking. The'only interpretations we have been, able to find are those made by the Veterans’ Administration and the Department of the Army.
The publication of the Veterans’ Administration, “Adjudication — Veterans’ Claims — Service Requirements,” p. 17-211, states:
1068. Definition of “explosion of an instrumentality of war”. — This term, as used in section 212, Public No. 212, 72nd Congress, as amended by Public No. 743, 76th Congress, signifies a sudden explosion or a violent bursting of an instrumentality of war, such as the explosion of a bomb, hand grenade, shrapnel, bullet, etc. and is not applicable to disabilities incurred as a result of crashes or collapses of instrumentalities of war (August 9, 1946).
The Department of the Army initially construed the phrase to exclude from its meaning an injury caused by a ricocheting bullet which struck an officer in a rifle pit. 2 Bull. JAG 3, January 9,1944. This construction was completely reversed on August 28,1944, by a memorandum prepared by the Chief, Military Affairs Division, Office of the Judge Advocate General, and subsequently adopted by the Judge Advocate General. This memorandum states in part:
The statute itself is drawn in' broad terms and does not limit itself to any particular type of explosion. It will be noted that the Act does not restrict its benefits to those officers disabled by an explosion, which might be construed to include only the effects of direct concussion or contact with the explosive, but expressly includes those officers who have disabilities “resulting from” an explosion. This seems to indicate an intent to benefit any officer whose disability, is proximately and directly the consequence of an explosion, whether the disability was caused by concussion, contact with the explosive, or by an object set in motion by the explosion. It seems reasonable to assume that Congress- recognized that the handling of and proximity to explosives constituted an additional hazard of military service and that by enacting the amendment it intended to compensate, in part, for such hazard. On this assumption, there appears to be no reasonable basis for differentiating between cases where the disability resulted from the impact of an object set in motion by the explosion, whether it be a *406 bullet or a shell fragment, and cases where the injury is directly attributable to the concussion, so.long as the proximate cause of the injury is the explosion and not an intentional act * * *. It is, therefore, concluded that insofar as the earlier opinions of this office appear to lay down the rule that the only explosions contemplated by the mentioned legislation are those which occur spontaneously, due to a defect, or which are otherwise unusual or unnatural in origin, they are wanting in authority. * * *
The Judge Advocate General held that, “As the disability of Lt. Hickey resulted from being struck by a ‘ricocheting bullet’ it is directly attributable to the explosion which gave the bullet its initial impetus, and it should be concluded that this officer comes within the exception created by the mentioned legislation.” Numerous other cases are cited in the memorandum, the one of a Lt. Leo K. Hickey, 0-1295019, being closest in analogy to that of plaintiff. Under the facts and the law of the case at bar we find it unnecessary to discuss the arguments of counsel concerning the interpretation of the phrase, “explosion of an instrumentality of war.”
Plaintiff is not entitled to recover and his petition is dismissed. It is so ordered.
MaddeN, Judge; Whitakeh, Judge; LittletoN, Judge; and JONES, OMef Judge, concur.

 Veterans’ Regulation Numbered 1 (a), Part I, paragraph I, E. O. No. 6156, June 6, 1933, 38 U. S. C. 4264, was amended by section 9 (a), Act of July 13, 1943 (Public Law 144, 78th Congress), to include enlistment or employment entered' into on or after Dec. 7, 1941, and active service before the termination of World War II.

 Section 2 of Act Aug.-10, 1946, cited to text, provided that the authority to employ retired commissioned .or warrant officers contained in this section shall be effective for a period of five years from Aug. 10, 1946.